Brady L. Rasmussen (9619)
**JONES WALDO HOLBROOK & MCDONOUGH, P.C.**
170 South Main Street, Suite 1500
Salt Lake City, Utah  84101
TELEPHONE: (801) 521-3200
brasmussen@joneswaldo.com

*Attorneys for the Plaintiffs*


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## THIRD JUDICIAL DISTRICT

| | | |
|---|---|---|
| **PATRICIA L. POWELL and**<br>**ROBERT B. POWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.**  2:20-cv-00306 |
| | ) | |
| **WRIGHT MEDICAL TECHNOLOGY, INC.,** | ) | Judge Robert J. Shelby |
| | ) | |
| **Defendant.** | ) | |

### COMPLAINT FOR DAMAGES

Plaintiffs Patricia Powell ("Plaintiff") and Robert Powell files this Complaint for Damages and Jury Trial Demand against Defendant Wright Medical Technology, Inc. ("Wright" or "Wright Medical"), a Delaware corporation whose principal place of business is in Memphis, Shelby County, Tennessee, respectively showing the Court the following:

### NATURE OF ACTION

1.      This is a complaint for damages associated with metal wear debris, corrosion and resultant metal ions from a failed Wright Medical Dynasty® metal-on-metal ("MoM") hip implant.

2.      For many years, Defendant has known its hip replacement device – the Wright Medical Dynasty® Total Hip System ("Dynasty® Total Hip System," "Dynasty® Device," or the

1

"Device") – was prone to fretting and corrosion and had a propensity to fail within a few years of implantation despite that hip implant devices typically up to twenty years or more. The articulating pieces (femoral ball, liner, and cup) of Defendant Wright's Device are comprised of a cobalt and chromium ("CoCr") alloy. As designed, the Device's metal-on-metal components generate metal debris, corrosion and metal ions, which cause dangerously elevated blood levels of CoCr ions, adverse tissue reactions, pseudotumors, necrosis, bone loss and other adverse medical events in patients. As a result of the Device's defects and Wright's tortious acts/omissions, Plaintiff Patricia Powell and many other patients who received these Devices endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent surgery to replace the defective Device, giving rise to more pain and suffering, a prolonged recovery time, and an increased risk of complications and death from surgery.

## PARTIES

3.      At all relevant times hereto, Plaintiff Patricia Powell and Robert Powell, husband and wife, were and are adult residents and citizens of the State of Utah, residing in Taylorsville, Salt Lake County.

4.      Defendant Wright Medical Technology, Inc. (hereinafter "Wright" or "Wright Medical") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Memphis, Tennessee, and as such is a citizen of both the State of Tennessee and the State of Delaware. Defendant Wright is registered to do business in the State of Tennessee and may be served with process by serving its registered agent for service, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203-1312.

5.      Defendant Wright was, at all relevant times, engaged in the business of designing, developing, manufacturing, distributing, selling, marketing and/or introducing into interstate

commerce, either directly or indirectly through third parties or related entities, various prosthetic orthopedic products, including the Conserve® Total Hip System at issue in this civil action.

## STATEMENT OF JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391, et seq., because a substantial part of the events giving rise to this claim occurred in Utah and in this district.

8. Defendant is subject to the Court's personal jurisdiction because at all times relevant hereto Defendant transacted business in and continues to transact business in the State of Utah.  Defendant has sufficient minimum contacts with Utah such that exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

9. At all times relevant hereto, Wright advertised, promoted, marketed, sold and/or distributed the defective Conserve® Total Hip System, including the Conserve® femoral head and Conserve® acetabular cup, throughout the United States, including the State of Utah.

## FACTUAL ALLEGATIONS

### A. The Device and Its Regulatory History

10. Between approximately 2003 and 2011, Wright marketed and sold several metal-on-metal ("MoM") hip replacement devices, one of which was the Dynasty® Total Hip Device.

11. The Dynasty® Total Hip Device was developed for use in total hip replacements and included five metal components:  (1) a stem inserted into the patient's femur, (2) a neck that connects the stem to (3) a BFH metal femoral head (which Wright called the "BFH" – for "big femoral head" -  and the A-Class BFH), (4) a metal liner, and (5) an acetabular shell.

12.     The Dynasty® Total Hip Device, like all hip implant products, is regulated by the Food and Drug Administration ("FDA") as a Class III Medical Device, pursuant to 21 U.S.C. § 360c and 21 C.F.R. § 88 888.3330, Prosthetic Devices.

13.     For Class III devices, the FDA requires compliance with either the Pre-Market Approval process ("PMA") or the section 510(k) substantial equivalence pre-market clearance process before a manufacturer can market and sell a total hip replacement or hip resurfacing device in the United States.

14.     On July 1, 2002, the FDA gave Wright 510(k) clearance to market the Metal Transcend Articulation System (Larger Sizes), which was re-branded the "Conserve" and is one of the components included in the Dynasty® Total Hip Device.

15.     Several different acetabular shells were developed for use with the Dynasty® Device, including:  the "Thick Shell" (with a 5 mm wall thickness), the "Thin Shell" (with a 3 to 4 mm wall thickness), the "Spiked Shell" (with spikes), and the "HA Shell" (with a hydroxyl apatite coating to facilitate bony ingrowth).  (K041425 (Thick Shell); K031963 (Spiked Shell); K042530 (HA Shell); K113322 (Thin Shell)).

16.     Wright obtained FDA 510(k) clearance to market the Spiked Shell (in 2003), the HA Shell (in 2004), and the Thick Shell (in 2004).  (*See id.*)

17.     Wright also received FDA 510(k) clearance to market the A-Class femoral head in 2005 (K051348).

18.     But, despite that more than 90% of the acetabular shells that Wright marketed and sold with Dynasty® Devices between 2003 and 2011 were Thin Shells, Wright failed to seek FDA 510(k) clearance to market the Thin Shell until November 2011, and did not receive any FDA clearance to market the Thin Shell until February 2012.  (K113322).

19.    By February 2012, Wright had no market for the Dynasty® Hip Devices and had, in fact, stopped marketing the Dynasty® Devices.

**B. Wright's History with the Device.**

20.    Wright purchased Orthomet, Inc. to obtain a stake in the new and profitable MoM hip replacement device market.  In the early 1990s, after establishing itself in small joint orthopedics and total knee replacements, Wright decided to move into the hip replacement market.

21.    Wright purchased Orthomet, Inc. in December 1994 because Orthomet was in the development stages of two MoM hip systems: the Transcend Metal-on-Metal Total Hip System (which eventually became the Conserve® Total Hip Device) and the Conserve® Resurfacing Device.

22.    Orthomet hired Dr. Harlan Amstutz, a McKee fellow, a MoM proponent, and the designer of the Tharies (a previous failed Zimmer resurfacing device), as the lead surgeon designer for the Conserve® Devices.

23.    As of the mid-1990s, the majority of the devices available for hip replacement utilized a press fit metal shell with porous coating and a separate polyethylene liner with a ceramic or metal head. Although Wright recognized that this construct was seeing good success, Wright also recognized the substantial potential for a metal-on-metal articulation in hip replacement as an alternative to using polyethylene.

24.    In the late 1990s, Wright hoped to be the only orthopaedic medical device company to offer a total resurfacing device in the United States, but because the McMinn System was already on the market in European countries, Wright needed to move quickly to get its resurfacing Device on the U.S. market.

25.    Wright considered its MoM products as having the potential to capture a significant market share in the United States.

6

26.    In July 1993, Al Lippincott from Orthomet prepared a product initiation request for a metal-on-metal system, recognizing that, Orthomet had an opportunity to establish itself as a forerunner in orthopedic research with development of a new metal-on-metal hip system and could gain substantial market share of the hip implant market.

27.    At that time, Orthomet recognized that several companies, including Sulzer, DePuy, Smith & Nephew, Zimmer, and others were currently re-evaluating metal-on-metal systems.

28.    In November 1995, Wright Medical employees Al Lippincott and Robert L. Conta, then Vice President of Development & Technology, attended a four-day conference, chaired by Dr. Harlan C. Amstutz, and organized by the Joint Replacement Institute in Los Angeles.  There, industry professionals and experts held a four day MoM summit, open discussion, debate, and dialogue about metal-on-metal hips, addressing the technology, the clinical significance of wear debris, implant tribology, The need for changes, the types of studies needed to make sure they were safe, and similar issues.

29.    Conclusions drawn at the MoM summit included the possibility that MoM is not a good alternative to polyethylene, and that more needed to be learned and studied regarding the risks associated with MoM bearing surfaces.

30.    In 1995, prior to marketing the Dynasty® Devices, Wright was notified by leading surgeons and designers of a number of major MoM risks that demanded further testing, such as: metal toxicity, inflammation, bone loss, allergic reaction, local tumor formation, systemic effects, soft tissue necrosis, osteolysis, and blood-borne metal ions.

31.     Yet Wright did not conduct any studies to investigate these known risks prior to marketing its Dynasty® Devices and components, and has never performed any tests related to most of the "hot-button" issues that forced surgeons to reject metal-on-metal implants in the 1970s.

**C.  The Conserve Thin Shell Never Received PMA Approval and Was a Regulatory and Clinical Failure.**

32.     In 2000, Wright initiated clinical studies of its Conserve® Plus Hip Resurfacing device, which was conducted under Investigational Device Exemption ("IDE")[1] G990328.

33.     In September 2003, Wright submitted a Pre-Market Approval (PMA) submission, #P030042, for its Conserve® Plus Resurfacing Hip System, which utilized a Thick Shell (with a 5mm wall thickness).

34.     Following a January 2004 inspection related to the Conserve® Plus Resurfacing Hip System PMA #P030042 and IDE study G990328, Wright was cited for failure to properly monitor studies and failure to report adverse events.

35.     Dr. Harlan Amstutz was similarly cited.

36.     In July 2004, Wright was placed on Integrity Hold for regulatory violations related to the Conserve® Plus Resurfacing Hip System PMA #P030042 and IDE study G990328.

37.     Due to the FDA's Integrity Hold, Wright could not submit products for approval without an independent third party first reviewing its submission.  Wright contracted with Phiama Consulting and Health Policy Associates to conduct a review of device submissions to ensure the overall quality of Wright's future US regulatory submissions.

---

[1] An IDE allows a non-cleared, non-approved medical device to be used as part of a clinical study to collect data as to safety and efficacy to support a PMA application or 510(k) premarket notification submission to the FDA.

38.     The FDA continued to institute an Integrity Hold for Wright's products for over three years until September of 2007.

39.     Wright further sought to add a Thin Shell (with a 3.5mm wall thickness) to its Resurfacing PMA submission.  But the clinical data from Wright's Conserve® Plus Resurfacing Device's Thin Shell IDE cohort showed such high failures that Wright withdrew the Thin Shell from its PMA application at least twice between 2003 and November 2011, due to the high failure rate and lack of follow-up.

40.     Wright's Conserve® Resurfacing Device IDE clinical study results utilizing the Thin Shell showed a revision rate - a failure of Conserve® device requiring surgery to replace the components - of 18.6% of the patients at 24+ months.

41.     Nonetheless, and despite its IDE clinical studies demonstrating the Thin Shell's clinical failure, from 2003 through 2011, Wright marketed its MoM devices, including the Dynasty® Device, utilizing the Thin Shell – a device never PMA approved and not 510(k) cleared by the FDA until 2012.

42.     Wright never informed surgeons or patients that its own clinical studies revealed that the Thin Shell caused an extraordinarily high revision rate of 18.6% at the 24 plus month period.

43.     The FDA found Wright had under-reported Thin Shell failures and that the Thin Shell's revision rate exceeded 33% in Wright's clinical studies.

**D.  Wright Obtained Pre-Marketing 510(k) Clearance For Some – But Not All – Conserve®
Components.**

44.     Wright sought FDA clearance to market its Dynasty® Total Hip Device through the 510(k) "substantial equivalence" process.

9

45.    A 510(k) notice is a premarket submission in which the manufacturer claims the submitted device is substantially equivalent to a predicate device that is already on the market.

46.    Wright represented that its first MoM device, the Transcend (later renamed "Conserve"), was substantially equivalent to the previously marketed McKee-Farrar device.

47.    The McKee-Farrar device, a MoM design first used in 1960, was removed from the market in the 1970s because of problems with osteolysis, inflammation, cystic responses, cyto-toxic metal ions and tissue reactions necessitating revisions in 50% of the implants, according to the designer, Dr. George McKee.

48.    Due to the poor clinical results of the McKee-Farrar device, the FDA refused to allow it as an acceptable predicate design and demanded testing for Wright's Metal Transcend Articulation System (1997) submission (K964627).

49.    The 1997 510(k) submission for the Metal Transcend Articulation System K964627 was never cleared for marketing.

50.    In 2001, Wright obtained 510(k) clearance for its modular Metal Transcend Articulation System, consisting of three components (a screw-fit 7(K004043), metal shell, metal liner, and metal head) intended for use in total hip arthroplasty.

51.    In 2002, Wright received 510(k) clearance to market the monoblock Metal Transcend Articulation System (Larger Sizes) for use in total hip arthroplasty, utilizing a one-piece (or "monoblock") Thick Shell (with a 5mm wall thickness) and a metal femoral head based on its purported equivalence to the Metal transcend Articulation System (K004043).  (K021349).

52.    In August 2005, Wright received FDA clearance to market the A-Class Conserve® Total Femoral Head (K051348).

53.    As Wright touted its "soon to be approved resurfacing device" to surgeons and customers, Wright marketing personnel and agents realized that the Dynasty® could be sold as a total hip process and also had great promise for huge profits as a total hip replacement.

**E.    Wright Dodged the FDA Through Inappropriate Use of a "Letter to File," In Lieu Of the 510(k) Process, For the Conserve® Thin Shell.**

54.    In 2003, Wright introduced its Conserve® Thin Shell (with a 3.5mm wall thickness) to its Dynasty® Devices without notification to FDA or 510(k) clearance, let alone PMA.

55.    To avoid the FDA's premarket approval ("PMA") and 510(k) processes, Wright used a "Letter to File," an internal Wright decision to market the Thin Shell without notice to FDA. This regulatory shortcut for the Conserve® Thin Shell was based on the supposed "Minor Modification" to other substantially similar devices on the market.

56.    Wright marketed the Conserve® Thin Shell for more than eight (8) years without FDA notice or review, despite substantial clinical evidence collected through its Conserve® Plus Resurfacing Thin Shell IDE study that the Conserve® Thin Shell had poor outcomes.

57.    Wright later acknowledged that a design change affecting safety and efficacy to a device is not appropriate for an internal Letter to File.

58.    A wall thickness change from 5mm for the Conserve® Thick Shell to 3.5mm for the Conserve® Thin Shell is a modification that affects the safety and effectiveness of the Conserve® Devices, yet Wright did not conduct any clinical testing beyond the failed IDE to evaluate whether the change from a Thick Shell to a Thin Shell affected safety or efficacy.

59.    Because the change from the 5mm Conserve® Thick Shell to the 3.5mm Conserve® Thin Shell was significant, and Wright did not account for the risk from this change in its Letter to File MM03-0004, Wright's decision to utilize a Letter to File in lieu of 510(k) clearance was incorrect.

60.    Instead of utilizing a unilateral Letter to File, Wright was required to obtain 510(k) clearance to legally market the Conserve® Thin Shell.

**F.  Wright Belatedly Obtained (Post-Market) 510(k) Clearance for the Thin Shell.**

61.    In September 2011, Wright finally acknowledged that the Thin Shell design marketed under the February 13, 2003 Letter to File "Minor Modification" presented a new worse case (thinner shell) and therefore should have been submitted to FDA for review under the 510(k) process before marketing and sale of the Conserve® Thin Shell began in 2003.

62.    As Wright consistently collected information questioning the safety and efficacy of its Conserve® Devices and their components, it continued to promote the Conserve® Hip Devices using false and misleading data.

63.    For example, Wright continued to advertise that the Conserve® A-Class Device generated fewer metal ions even though its own studies suggested the opposite conclusion.

**G.  Wright Aggressively Marketed the Device as Appropriate for Active Patients.**

64.    The Dynasty® Hip Device's use of BFH technology and A-Class metal was marketed to surgeons as capable of increasing range of motion, decreasing dislocation issues, lower wear, and biocompatibility, all of which were presented as significant benefits for young and active recipients as well as anyone possessing a high-demand hip.

65.    When Wright marketed the Dynasty® Total Hip Device to surgeons, it claimed the device was ideal for young, very active patients because post-hip-replacement, those patients could be as active as they wanted to be, with a greater range of motion without dislocation or wear related concerns.

66.    Wright hired professional tennis player and celebrity Jimmy Connors as a spokesperson of Wright to endorse and market its MoM Devices.  Wright represented that with his

new MoM Device, Mr. Connors was back on the tennis court in 6 weeks, a result that should be expected by patients who were implanted with its MoM Devices

67.    In marketing the MoM Devices, such as the Dynasty, Wright used marketing materials (websites, journal ads, brochures, pamphlets, patient testimonials, endorsements, newspaper articles and other PR) aimed at surgeons and younger, more active consumers who wanted to return to the following strenuous physical activities, among others, that Wright advertised:

   a.  Surfing;

   b.  Yoga

   c.  Skiing;

   d.  Martial Arts, including competition levels;

   e.  Hockey;

   f.  Ice Skating;

   g.  Motorcycling;

   h.  Horseback rides;

   i.  Tennis;

   j.  Golf;

   k.  Soccer;

   l.  Football;

   m. Mountain climbing;

   n.  Running, including marathons and triathlons;

   o.  Hiking;

   p.  Biking, including trail riding;

q.  Swimming;

r.  Racquetball;

s.  Active military duty;

t.  Competitive wrestling; and

u.  Kayaking.

68.    Representative ads include:



69.    Wright's marketing of its MoM Devices included the following testimonials from patients and surgeons:

a.  "Before the surgery I couldn't run.  I couldn't play soccer.  Now, there's no pain in the joint at all.  Hip replacement gave me my life back."

b.  "Because the procedure allows him to be as aggressive as he wanted to be, there -- there was no reason for me to tell him to hold back."

14

    c.   "Some patients have been able to pursue more vigorous activities, including martial arts, hockey, running marathons, even climbing Mount Kilimanjaro."

    d.   Wright Medical which makes the Dynasty® Total hip, said the "hip replacement lasts 25 to 30 years."

    e.   "Just six weeks after his [minimally invasive surgical] hip procedure, [Jimmy Connors] completed filming for a tennis training DVD."

70.    When Wright marketed the Dynasty® Total Hip Device to surgeons, it claimed that the device was fully biocompatible and that the device had good longevity.

71.    Wright also knew researchers were advising against using MoM implants in female patients and its own internal information showed dangerously high revision rates in women.

72.    Nonetheless, Wright continued to aggressively market its products for use by women.

73.    Wright's partners at the Oxford Group (Richie Gill) reported unfavorable findings on the MoM Devices, including a strong suggestion of pseudotumors associated with MoM wear and recommended that Wright's MoM Devices not be implanted in women.

74.    Wright also knew researchers were advising against putting the similar DePuy ASR devices in women, and that its partners in Oxford planned to publish a paper warning against MoM hip resurfacing in young females.

75.    But Wright continued to market the Dynasty® Devices to younger, active lifestyle women; including younger women engaging in competitive martial arts, ice skating, running, dirt biking, even those who desired to be "physically aggressive."

**H.  Wright Minimized the Known Risk of Elevated Metal Ion Levels.**

76.    Wright never provided any information to surgeons regarding what was considered a dangerous cobalt or chromium ion level for a patient with a MoM Dynasty® Device.

77.    Wright never told surgeons about the risks and problems associated with its Dynasty® Total Hip Device, including metallosis.

78.    The biggest concern Wright faced in selling the Dynasty® Device was the issue of metal ion release, as surgeons' top concern was the metal ions.

79.    Before, during and after Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright knew of the principles and concerns associated with MoM devices generating wear debris and releasing toxic cobalt and chromium heavy metal ions.

80.    Despite its knowledge that metal ions associated with MoM hips presented significant risks, Wright worked to convince surgeons that metal ions were not an issue with the Dynasty® Devices.

81.    Wright was aware as of 1998 that research indicated that at three years post-implantation, there was as much as a 5X  increase in the concentration of chromium in the serum and 8X increase in the concentration of chromium in the urine for metal-on-metal versus metal-on-polyethylene hip replacement devices.

82.    No later than 2003, Wright recognized that metallic particulate debris is approximately an order of magnitude smaller than PE debris, so that even low rates of volumetric wear could lead to large numbers of particles.

83.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Devices, Wright knew that surgeons were concerned about metal ion release and its effects on the body.

84.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright knew patients with MoM hip implants exhibited 10 times higher concentrations of metal ions compared to patients with MoP hip implants.

85.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright knew that Cobalt and Chromium ions cause metallosis, necrosis, inflammation, bone loss, cup loosening, ALVAL and pseudotumors.

86.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Devics, Wright knew there were reports that Cobalt and Chromium ions have toxic effects.

87.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Devices, Wright had available literature that indicated that combined ion levels of Cobalt and Chromium of 5 parts per billion ("ppb") generated immune suppression.

88.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright had literature available that indicated that cobalt and Chromium ion levels at 7 ppb were considered elevated and indicated that a patient and her physicians should consider revision.

89.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright did not know how to evaluate the significance of Cobalt and Chromium metal ion levels.

90.     Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright did not know what levels of Cobalt and/or Chromium ion levels would or could cause harm.

91.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright did not know the long-term consequences to patients of exposure to Cobalt and Chromium ions.

92.    Despite the concerns for the effect, danger and damage potentially caused by Cobalt and Chromium ions, and despite not knowing what ion levels would be safe, acceptable, injurious or dangerous, Wright undertook no biocompatibility or any other testing to determine whether metal-ion release from the Dynasty® Device was safe.

93.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright never tried to determine what levels of Cobalt or Chromium are toxic.

94.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright did no testing to assess the risk of metal ion release or the effects of metal ion release on the human body.

95.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright conducted no clinical studies to determine or evaluate the local or systemic effect of Cobalt and Chromium ions.

96.    Before, during and since Wright designed, developed, manufactured, marketed and sold its Dynasty® Device, Wright never did any testing to determine the risk posed to patients from exposure to Cobalt and Chromium ions.

97.    Wright recognized that surgeons' biggest concern about the use of metal-on-metal hip devices was the generation of metal ions. Therefore, Wright had to convince surgeons that metal ions would not be an issue with the Dynasty® Hip Implant.

98.     Minimizing metal ions was such a huge concern for Wright in marketing its Dynasty® Device that it focused extensively on minimizing metal-ion concerns through publications and speakers.

99.     Wright utilized consulting surgeon Key Opinion Leaders' ("KOL's") presentations to orthopaedic groups and peer reviewed data, paid-for scientific data publications, celebrity endorsements, and sales representative training, among other avenues, to falsely assuage metal-ion concerns and market the Conserve® Device.

100.     Throughout the Dynasty® Device's marketed lifespan, Wright consistently boasted in its marketing that metal ions from Dynasty® Device are harmless.

101.     In fact, Wright's OrthoRecon marketing department disregarded field concerns over metal ion issues and told surgeons that Wright had no negative reports for metal ion issues.

102.     Wright did not inform surgeons or potential patients of its concerns or lack of knowledge regarding the release of Cobalt and Chromium ions from Dynasty® Total Hip Implants, despite acknowledging that surgeons and patients were concerned about the issue.

103.     In fact, Wright, as early as 2002, told its sales personnel, who were in direct contact with surgeons, that, "the effects of metal ion release are known and have been demonstrated to be safe," which was the equivalent of decriminalizing metal ions.

**I.   Wright Studied Metal Ions Solely to Support A-Class Sales.**

104.     Wright decided to run metal ion studies, not to determine safe levels of metal ions, but instead to be able to market that its Dynasty® Total Hip Device utilizing an A-Class femoral head (which utilized a "harder" Cobalt and Chromium metal alloy than the standard femoral head) would generate fewer metal ions than Wright's competitor and thus Wright could sell the A-Class device at a higher price.

105.    Wright aggressively marketed its A-Class metal, which it contended resulted in less wear, less metal debris and, by implication, fewer metal ions.

106.    Wright utilized taglines such as "Reduced Wear, Increased Longevity," "A-Class Never Compromise," and "A Hip for Life" in marketing it's a-Class BFH technology with the Dynasty® Total Hip Device.

107.    Wright ignored that its A-Class metal ions studies were a failure, demonstrating that less wear did not translate into fewer metal ions.

108.    Even Wright's internal metal ion studies conducted by key Conserve® Device KOLs and surgeon consultants such as Paul Beaule, M.D., Josh Jacobs, M.D., and Koen DeSmet, M.D. could not prove that the generation of less wear debris correlated with fewer metal ions, despite Wright's touting this alleged A-Class design advantage.

**J.    Wright's Representations and Reasonable/Justifiable Reliance.**

109.    Wright also told Gary Lynn Rasmussen, M.D. ("Dr. Rasmussen"), the implanting surgeon, that the cobalt chromium head, liner, and cup articulation should last longer than a traditional Metal/Poly liner, and that there were no known issues associated with cobalt and chromium ions.

110.    Based on Dr. Rasmussen's information from Wright about the benefits of the Dynasty® Total Hip Device and no known risks from metal ions, and his recommendation, Plaintiff decided to proceed with an elective left THR to implant a MoM Dynasty® Total Hip Device, utilizing the Thin Shell, and not another type of available hip such as the ceramic/poly.

111.    On or about, December 30, 2009, Dr. Rasmussen implanted a Wright Dynasty® system in Plaintiff Powell, including the following components:    A Wright Conserve® Total

Femoral Head with BFH Technology, a Dynasty CoCr Liner, a Profemur RAZ Stem and Profemur Short Titanium Neck.

112.    In May 2016, Plaintiff experienced failure with increasing pain in Plaintiff's left hip with activity.

113.    On or about May 11, 2016, Plaintiff entered the hospital for left hip revision surgery due to a failed left total hip arthroplasty.

114.    Intraoperatively, Dr. Rasmussen performed the revision surgeon and noted evidence of elevated cobalt chromium levels, a classic indicator of metallosis, or damage to the hip joint secondary to the generation of metal wear and debris.

115.    Dr. Rasmussen indicated that Plaintiff's Conserve® Total Hip Device had failed due to metallosis, i.e., acute onset of pain, high cobalt chromium levels, soft tissue inflammation.

116.    Since Plaintiff's Dynasty® left hip revision surgery, Plaintiff is still restricted in activities, and had to give up activities that require exertion of her left hip, for example, avoiding stairs and moderate lifting/dragging.

117.    Numerous physicians who previously had Wright consulting contracts have testified that, had they been aware of the risks back in the early to mid-2000s when they first started implanting the Dynasty® hip replacement Device, they would not have chosen those implants.

118.    Presently, Dr. Rasmussen is aware of risks associated with the Dynasty® hip implant such as adverse reaction, metal ions, metallosis, necrotic tissues that he was not aware of at the time of Plaintiff's implant surgery in December of 2009.

119.    If Dr. Rasmussen had known in December 2009 what he knows now about the risks from metallosis from the Dynasty® Total Hip Device, he would not have implanted it in Plaintiff.

120.    Wright marketed that the Dynasty® Devices experienced acceptably low failure rates, despite real revision rates reported via medical device registries and surgeons' actual revisions demonstrating that the Dynasty® Devices had a statistically unacceptably high failure rate.

121.    Wright has never reported the Dynasty® Device's high failure rates to surgeons, to patients with implanted Dynasty® Devices, or to the public.

122.    Wright continued to market the Dynasty® Devices even as its own KOLs, consultants, researchers and surgeons were reporting high failure rates and other problems with the implant, and even discontinuing use of the Conserve® Devices.

123.    Wright received complaints and reports of unacceptable failure rates of its MoM Devices from Brad Penenberg, M.D., a Wright KOL, consultant, Peer-to-Peer trainer, premier Los Angeles surgeon and MoM Devices royalty recipient, who concluded Wright's MoM Devices were not a successful product and stopped using them because of problems he experienced with the Devices starting in 2007.

124.    Although Patrick Fisher, Director of Hip Marketing admitted that it was significant that Wright's most prominent, highest paid consultant thought their MoM Devices were a failure, Wright never shared that information with other surgeons or the public.

125.    C. Lowry Barnes, M.D., from Little Rock, Arkansas, a Wright KOL, consultant, and Peer-to-Peer trainer, complained about Wright's MoM Devices and stopped using them.

126.    G. Lynn Rasmussen, M.D., and his partner, Kent Samuelson, M.D., both Wright KOLs, consultants and high-volume Wright MoM Device implant surgeons in Salt Lake City, Utah, stopped using the MoM Devices because of unacceptably high failure rates.

127.    Michael Andersen, M.D., a Wright KOL, product champion, MoM Devices royalty recipient from Germantown, Wisconsin, had problems with the MoM Devices that were known to Wright.

128.    Michael Dunbar, M.D., from Halifax, Nova Scotia, reported a 20% Conserve® Device failure rate to Wright in March 2008 and discontinued using the MoM Devices.

129.    Edward Sparling, from Vancouver, Washington, a high-volume Wright surgeon, KOL, consultant and IDE participant, reported problems with MoM Devices to Wright and stopped using them in April 2009.

130.    Richard Weiner, M.D., from Palm Beach, Florida, a high-volume Wright surgeon, reported high MoM Device failure rates to Wright, advised Wright that the Conserve® Devices should never be implanted in women, and stopped using the MoM Devices.

131.    Raymond Corpe, M.D., from Augusta, Georgia, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about the MoM Devices and stopped using the Wright MoM Devices.

132.    Vincent Fowble, M.D., from Jupiter, Florida, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about its MoM Devices and stopped using the Devices.

133.    Kace Ezzet, M.D., from La Jolla, California, reported high failure rates to Wright and as a result, stopped using the MoM Devices.

134.    Milton Smit, from Bradley, Illinois, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about the MoM Devices' high failure rates and stopped using the Devices.

### K.  Wright Ignored and Isolated Complaining Physicians.

135.    Wright created a smokescreen by isolating and blaming surgeons who reported failures, telling reporting surgeons that no other surgeons around the country were having failures.

136.    When distributor David J. Burke reported an increase in failed Conserve Devices to Wright, Wright told him that they were not having problems with the device and questioned whether the surgeons at issue had followed proper surgical protocol.

137.    Wright did not reveal these surgeon complaints and decisions not to use the MoM Devices to other surgeons, Wright's complaint department, Wright sales personnel or distributors, patients or the public.

138.    Internally, Wright's less-than-robust complaint department continued to receive complaints from all over the country regarding metal debris, reactions, pseudotumors and aseptic, lymphocyte-dominated vasculitis-associated lesions ("ALVAL") associated with its MoM Devices.

139.    Wright received registry data that showed increasing failures of MoM Devices, including:  a 2008 Australian Bone & Joint Registry Report of a 16.4% failure rate; a 2009 UK National Joint Registry Report of a 7.4% failure rate; a 2011 UK National Joint Registry Report of a 8.35% failure rate; and a 2012 UK National Joint Registry Report of an 8.52% failure rate at five years.

140.    In response to an Association of British Healthcare Industries ("ABHI") position statement on MoM hip bearings, Wright acknowledged it knew from the start that the clinical performance of early MoM devices "frequently and matter-of-factly mentioned tissue reactions, metallosis, and revisions due to pain."

## PLAINTIFF'S INJURIES AND DAMAGES

## PLAINTIFF PATRICIA POWELL'S Conserve® HIP

141.    On or about December 30, 2009, Plaintiff Patricia Powell had a Wright Dynasty® artificial hip implanted in her left hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

142.    Orthopedic surgeon Gary Rasmussen, M.D. performed the Index Surgery during which he implanted the Dynasty® Total Hip System in Plaintiff Patricia Powell.

143.    Plaintiff Powell's Index Surgery was performed at The Orthopedic Specialty Hospital, 5848 S Fashion Boulevard, Murray, Utah 84107. Dr. Rasmussen did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff Powell or negligently cause any injury to Plaintiff in any of the following respects:

(a)    in the care or treatment that he provided to Plaintiff Powell prior to beginning the hip implant surgery;

(b)    in the hip implant surgery he performed on Plaintiff; or

(c)    in the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery.

144.    Based upon the patient population that Wright intended its artificial hip devices to be implanted in, at the time of Plaintiff Powell's Index Surgery, she was an appropriate patient to be implanted with the Dynasty® Total Hip System.

145.    Dr. Rasmussen recommended the Dynasty® Total Hip System to Plaintiff Powell and indicated that the Device was appropriate for her.

146.    Plaintiff Powell reasonably relied upon Dr. Rasmussen in deciding to proceed with hip replacement surgery and have the Dynasty® Total Hip System implanted.

147.    Before or during the course of Plaintiff Powell's Index Surgery, Defendant arranged for the Conserve® Total Hip System that was implanted in Plaintiff to be delivered to The Orthopedic Specialty Hospital and/or Dr. Rasmussen for implantation in Plaintiff.

148.    Defendant, directly or through its subsidiaries or affiliates, designed, manufactured, distributed and sold in the United States various prosthetic orthopedic devices, including the Dynasty® Total Hip System implanted in Plaintiff Powell during the Index Surgery, which included the following components:

- Wright Conserve® Total A-Class Head
  38 mm
  Ref. No. 38AM-3835
  Lot No. 095271458

- Wright Dynasty® CoCr Liner
  38mm
  Ref No. DLCO-GD38
  Lot No. 08991148910

- Wright Dynasty® BIOFOAM Shell
  52 mm
  Ref. No. DSBF-GD52
  Lot No.  119937586

- Wright Profemur® Short Neck
  Ref. No. PHA0-1252
  Lot No.  089924930

- Wright Profemur® RAZ Femoral Stem
  Ref. No. PYRD-0003
  Lot No.  109933214

These Wright components are hereinafter collectively referred to as the "Dynasty® Total Hip System" or the "Device."

149.    At the Index Surgery, each of the components of Plaintiff Powell's Dynasty® Total Hip System was in substantially the same condition in all relevant respects as when they left Defendant's control.

26

150.    At all times relevant hereto, Plaintiff Powell used the Dynasty® Total Hip System implanted during the Index Surgery in a normal and reasonably foreseeable manner.

151.    On or about May 11, 2016, Plaintiff Powell reported to Dr. Rasmussen for revision surgery of her failed hip prosthesis ("Revision Surgery").  Dr. Rasmussen recommended the revision surgery after Plaintiff presented with increasing pain in her left hip.

152.    Plaintiff Powell's Revision Surgery was necessary because the Device failed due to adverse tissue reaction to metal debris, corrosion and resultant metal ions.

153.    The Revision Surgery was performed by Dr. Rasmussen at The Orthopedic Specialty Hospital, 5848 S Fashion Boulevard, Murray, Utah 84107.   During the Revision Surgery, Dr. Rasmussen removed failed components of Plaintiff Powell's Dynasty® Total Hip System.

154.    But for the fact that the Dynasty® Total Hip System had generated metal debris, metal ions and corroded causing it to fail and injure Plaintiff, Plaintiff Powell's Device was not otherwise in need of revision.

155.    On or about May 11, 2016, it was discovered that the Device failed due to metal debris, corrosion and resultant metal ions, due to the MoM design between the articulating surfaces, causing continuing and otherwise irreversible physical injury to Plaintiff Powell.

156.    On or about May 11, 2016, the Dynasty® Total Hip System implanted in Plaintiff's left hip was discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendant, as alleged in this Complaint.

157.    The Dynasty® Total Hip System (and its components), to include the Device implanted in Plaintiff Powell was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

(a)      it was and is unreasonably dangerous under Utah product liability law as a result of one or more or a combination of the following:

(i)      the      Conserve®      Total      Hip      Implant      System      was manufactured/designed in such a manner as to generate CoCr metal debris, corrosion and resultant CoCr metal ions, thereby increasing the potential for failure;

(ii)      the components were manufactured/designed in such a way as to make the articulating surfaces of the components susceptible to fretting and corrosion, thereby increasing the potential for failure; and

(iii)      there may be other conditions or defects yet to be determined.

(b)      it was dangerous to an extent beyond which could be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(i)      the ordinary consumer would not contemplate that the Device would create metal debris, metal ions and corrosion or that premature revision surgery would become necessary approximately seven (7) years after implantation; and

(ii)      the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the Device releasing harmful metal ions and metal debris in the consumer's body that caused adverse tissue reactions and other medical complications.

158.    The Device was not tested in design and development under conditions that were known would be encountered in the normal in vivo patient environment over substantial periods of time.

159.    The Device was not tested in design and development under the normal in vivo patient environmental conditions that were known would be encountered during normal use of the Device.

160.    The Device was not tested for the FDA Section 510(k) Premarket Notification Process under conditions that were known would be encountered in the normal in vivo patient environment.

161.    Wright's testing of the Device did not adhere to or meet FDA guidance.

162.    Wright knew the Device was failing from fretting and corrosion of the articulating surface prior to the day Wright provided its 510(k) submission to the FDA.

163.    Wright knew the Device was failing at higher than expected rates from fretting and corrosion of the articulating surface prior to the date of its implantation in Plaintiff Powell during the Index Surgery.

164.    Wright knew the Device was failing at higher than expected rates due to fretting and corrosion prior to the date of Plaintiff's Revision Surgery, during which it was discovered that Plaintiff suffered from adverse tissue reaction to metal debris, metal ions and corrosion.

165.    Prior to the Index Surgery, Wright did not warn patients, surgeons, customers, or its sales representatives/distributors that the Device was known to be failing from metal debris and corrosion at higher than expected rates.

166.    On or about May 11, 2016, Plaintiff Powell discovered the Device implanted in her left side failed due to elevated cobalt chromium levels, metal ions and corrosion as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

167.    As a direct and proximate result of the failure of the Dynasty® Total Hip System, Plaintiff Powell has sustained injuries and damages, including, but not limited to:

(a)    undergoing surgery to remove and replace the failed prosthesis;

(b)    past and future pain and anguish, both in mind and in body;

(c)    permanent diminishment of her ability to participate in and enjoy the affairs of life;

(d)    medical bills associated with the revision surgery and recovery therefrom;

(e)    future medical expenses;

(f)    loss of enjoyment of life;

(g)    loss of past and future earnings and earning capacity;

(h)    disfigurement; and

(i)    physical impairment.

## **FEDERAL STATUTORY AND REGULATORY REQUIREMENTS**

168.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  21 U.S.C. § 351.

169.    Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  21 U.S.C. § 352.

170.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prevent introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device

has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.  21 U.S.C. § 360(i).

171.    Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the safety or effectiveness of a device), packaging, storage and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

172.    The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, *et seq.*  As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

173.    Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act").  21 U.S.C. § 351.

174.    Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes and resources for implementing quality management.  21 C.F.R. § 820.3(v).

175.    Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

176.    Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

177.    Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

178.    Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

179.    Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

180.    Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents.  Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

181.    Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

182.    Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

183.    Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Such process controls shall include:

(a)    documented instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

(b)    monitoring and control of process parameters and component and device characteristics during production;

(c)    compliance with specified reference standards or codes;

(d)    the approval of processes and process equipment; and

(e)    criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

184.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process or procedure.

185.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

186.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on produce quality.

187.    Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed and installed to facilitate maintenance, adjustment, cleaning an use.

188.    Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

189.    Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

190.    Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each

manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

191.    Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures.    "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications.  *See* 21 C.F.R. § 820.3(z)(1).

192.    Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met.  Each manufacturer shall ensure that validated processes are performed by qualified individuals.

193.    Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

194.    Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.  The procedures shall include requirements for:

(a)    analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

(b)    investigating the cause of nonconformities relating to product, processes and the quality system;

(c)    identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)    verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)    implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)    ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g)    submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

195.    Upon information and belief, Wright's Dynasty® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  *See* 21 U.S.C. § 351.

196.    Upon information and belief, Wright's Dynasty® Total Hip System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  *See* 21 U.S.C. § 352.

197.    Upon information and belief, Wright's Dynasty® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because Wright failed to establish and maintain CGMP for its Dynasty® Total Hip System, including components, in accordance with 21 C.F.R. § 820, *et seq.*, as set forth above.

198. Upon information and belief, Wright failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for its Dynasty® Total Hip System, including its components.

199. As a result of Wright's failure to establish and maintain CGMP as set forth above, Wright's Dynasty® Total Hip System was defective and failed, resulting in injuries to Plaintiff Powell.

200. If Wright had complied with the federal requirements regarding CGMP, Wright's Medical Dynasty® Total Hip System would have been manufactured and/or designed properly such that it would not have resulted in injuries to Plaintiff.

201. Plaintiff Powell's injuries were both factually and proximately caused by the Defendant's defective Dynasty® Total Hip System.

202. Plaintiff Powell's injuries were both factually and proximately caused by the Defendant's unreasonably dangerous Dynasty® Total Hip System.

203. Plaintiff Powell further shows that she is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that she has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## LIABILITY

## COUNT 1 – NEGLIGENT DESIGN AND FAILURE TO WARN OR INSTRUCT

204. Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

205. Wright owed a duty of reasonable care to the general public, including Plaintiff Patricia Powell, when it designed, manufactured, assembled, inspected, tested, marketed, placed

into the stream of commerce, and sold the Dynasty® Total Hip System, to protect users from an unreasonable risk of harm when using the Device for its intended purpose, in a reasonably foreseeable manner.

206.    Wright breached this duty by designing, manufacturing, assembling, inspecting, testing, marketing, distributing and selling the Dynasty® Total Hip System in a defective and unreasonably unsafe condition including, but not limited to, its foreseeably appreciated risk of harm from the device's propensity for fretting, corrosion and failure.  A reasonably prudent medical device manufacturer would not have acted in this manner.

207.    Likewise, Wright owed Plaintiff a duty of reasonable care to discover the defects and to inform and/or warn her or her implanting surgeon of the defects once they were discovered, and Defendant failed to warn of the dangers inherent in the reasonably foreseeable use of the Dynasty® Total Hip System, further placing Plaintiff at risk for harm and injury.

208.    Wright failed to exercise ordinary care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, warning, marketing, promotions and distribution of the Dynasty® Total Hip System.  Wright knew or should have known that these products cause significant bodily harm and were not safe for use by consumers, and/or through failure to comply with federal requirements.

209.    Wright, furthermore, in advertising, marketing, promoting, packaging and selling the Device negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Device was fit for its intended purpose when, in fact, it was not.

210.    Wright, in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Device had been adequately and reliably tested when, in fact, it had not.

211.    Wright, in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the risk of serious adverse events and/or effects from the Device was comparable to that of other hip replacements systems when, in fact, it was not.

212.    Wright, in advertising, marketing, promoting, packaging and selling the Device, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Device had not caused or contributed to serious adverse events and/or effects requiring the premature revision surgery to replace and/or repair the Device when, in fact, it had.

213.    Wright knew or had reason to know that Plaintiff Powell, as a member of the general public for whose use the Device was placed into interstate commerce, would be likely to use the Device in a manner described in this Complaint.

214.    Wright knew or should have known of the dangers associated with the manner and circumstances of Plaintiff's foreseeable use of the Device, which dangers would not be obvious to the general public.

215.    Despite the fact that Wright knew or should have known that the Dynasty® Total Hip System posed a serious risk of bodily harm to consumers, Wright continued to manufacture and market the Device for use by consumers and/or continued to fail to comply with federal requirements.

216.    Wright knew or should have known that consumers such as Plaintiff Powell would foreseeably suffer injury as a result of Wright's failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

217.    Wright's conduct, as described above, including, but not limited to, its failure to adequately test and warn as well as its continued marketing and distribution of the Dynasty® Total

Hip System when it knew or should have known of the serious health risks these Devices created and/or the failure to comply with federal requirements, was and is negligent.

218.    As a direct and proximate result of Wright's negligence, including negligent testing, failure to warn and misrepresentations, Plaintiff Powell suffered serious physical injury, harm, damages, and economic loss and will continue to suffer such harm, damages and economic loss in the future.

219.    As a direct and proximate result of Wright's negligence, Plaintiff Powell has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

220.    Wright was negligent in the particulars set forth in this Complaint, and such negligence was a direct and proximate cause of the incident and injuries set forth herein.

221.    As a direct and proximate result of Wright's negligence and its other tortious conduct, as set forth herein, Plaintiff Powell has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

## COUNT 2 – NEGLIGENT MISREPRESENTATION

222.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

223.    Wright had a duty to accurately and truthfully represent to the medical community, Plaintiff Powell, and the public that the Dynasty® Total Hip System had not been adequately tested nor found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, Wright made representations about the Device that it, at a minimum, should have known to be false.

224.    Wright negligently misrepresented to the medical community, implanting orthopedic surgeon Dr. Rasmussen, Plaintiff Powell, and the public that the Dynasty® Total Hip System presented no risk or a low risk of unreasonable and dangerous adverse side effects.

225.    Had Wright accurately and truthfully represented to the medical community, Dr. Rasmussen, Plaintiff, and the public the material facts that it knew or should have known regarding the risks of the Dynasty® Total Hip System, Plaintiff Powell and/or Plaintiff's healthcare provider(s) would not have utilized Wright's Dynasty® Total Hip System.

226.    As a direct and proximate result of Wright's negligent misrepresentations, Plaintiff Powell has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT 3 – FRAUD BY CONCEALMENT

227.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

228.    Wright had a duty to accurately and truthfully represent to the medical community, Plaintiff Powell, and the public that Wright Medical Conserve® Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, Wright knew, but deliberately failed to communicate this to Plaintiff or Plaintiff's surgeon.

229.    Wright had a duty to inform, but fraudulently concealed from the medical community, implanting orthopedic surgeon Dr. Rasmussen, Plaintiff Powell, and the public that

the Wright Medical Dynasty® Total Hip System had an unreasonable and dangerous risk of generating metal debris and metal ions causing bodily injury.

230.    Wright knew of the risk of metal debris and corrosion and resulting bodily injury present in the device implanted in Plaintiff, while neither Plaintiff nor Plaintiff's implanting surgeon had this information.  Neither Plaintiff Powell nor her implanting surgeon could have discovered this information through reasonable diligence.

231.    Wright had a duty to communicate the increased risk and known failures associated with the Device implanted in Plaintiff to Plaintiff and Plaintiff's surgeon.

232.    Plaintiff and Plaintiff's surgeon justifiably relied upon Wright to communicate known risks and failures in both the decision to implant the device and follow up treatment after index surgery.

233.    Had Wright accurately and truthfully represented to the medical community, Dr. Rasmussen, Plaintiff, and the public the material facts that it knew regarding the risks of the Dynasty® Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Wright's Dynasty® Total Hip System.

234.    Had Wright not fraudulently concealed the increased risk of metal debris, metal ions and corrosion, the dangers from corrosion and metal debris, the known failures of the device from Plaintiff or Plaintiff's surgeon, Plaintiff's injuries would have been avoided or limited.

235.    As a direct and proximate result of Wright's fraudulent concealments, Plaintiff Powell has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT 4 – FRAUDULENT MISREPRESENTATION

236.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

237.    Wright made false representations of material fact to Plaintiff and/or her healthcare providers as to the safety and efficacy of its Dynasty® Total Hip System before it was selected and utilized in Plaintiff's hip replacement surgery.

238.    Instead of disclosing the heightened risks of corrosion, failure, and permanent injury, Wright represented via printed literature and statements to surgeons:

    a)  that there was no indication of an increased risk of adverse events due to metal-on-metal articulation-generated fretting and corrosion;

    b)  that cobalt and chromium metal ions had been tested clinically;

    c)  that the clinical testing had shown that exposure to cobalt and chromium metal ions had proved them to be safe;

    d)  that cobalt-chromium articulating components resulted in less wear than metal-on-polyethylene and would last longer; and

    e)  that the Dynasty® Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

239.    Wright knew that the above representations alleged in paragraph 238 were false, yet willfully, wantonly, and recklessly disregarded the inaccuracies in its representations.

240.    Wright made these false representations with the intent of defrauding and deceiving the medical community (including implanting surgeon Dr. Rasmussen), Plaintiff, and the public, and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff and the public to

utilize its Dynasty® Total Hip System.  Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

241.    Plaintiff and her implanting orthopedic surgeon Dr. Rasmussen reasonably and justifiably relied upon Wright's false representations of material fact in deciding to utilize the Dynasty® Total Hip System.

242.    Had Plaintiff or her healthcare providers known the true facts about the dangers and health risks of the Wright Dynasty® Total Hip System, they would not have utilized the Device.

243.    As a direct and proximate result of Wright's fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT-5 LOSS OF CONSORTIUM

244.    Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

245.    Plaintiff Patricia Powell and Robert Powell are married and have at all relevant times hereto, inclusive of the date that the Device implanted in the Plaintiff Patricia Powell failed, requiring the Revision Surgery, been married.

244.    At all times herein mentioned, Plaintiffs Patricia Powell and Robert Powell were, and are, legally married as husband and wife.

245.    As a direct and proximate result of Defendant's defective Dynasty® Total Hip System and tortious conduct and as a result of the injuries and damages to Plaintiff Patricia Powell arising therefrom, Plaintiff Robert Powell has been deprived of the love, companionship, comfort,

affection, society, solace and moral support, protection, loss of enjoyment of sexual relations, and loss of physical assistance in the operation and maintenance of the home, of his wife Patricia Powell, and has thereby sustained and will continue to sustain damages.

246.    Plaintiff Robert Powell is entitled to recover damages for his loss of consortium in an amount to be determined by the trier of fact.

### COUNT 6 – PUNITIVE DAMAGES

247.  Plaintiffs incorporate by reference as if fully set forth herein the facts alleged in paragraphs 1-203 of this Complaint.

249. Wright knew or should have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in injury or damage and continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Accordingly, Plaintiff is entitled to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and an award of damages against Wright, as follows:

(a)    for special damages, to include past and future medical and incidental expenses, according to proof;

(b)    for past and future loss of earnings and/or earning capacity, according to proof;

(c)    for past and future general damages, to include pain and suffering, emotional distress and mental anguish, according to proof;

(d)    for exemplary and punitive damages in an amount to be determined at trial;

(e)    for damages for Plaintiff Robert Powell's loss of consortium, in an amount to be determined at trial;

(f)      for pre-judgment and post-judgment interest;

(g)      for the costs of this action, including reasonable attorneys' fees;

(h)      granting any and all such other and further legal and equitable relief as the Court

deems necessary, just and proper; and

**A TRIAL BY JURY IS RESPECTFULLY DEMANDED.**

Dated:  May 8, 2020.

Respectfully submitted,

_____

Brady Rasmussen
JONES WALDO, P.C.
170 S. Main Street, Suite 1500
Salt Lake City, UT 84101
Ph: (801)-534-7236
Fx: (801)-328-0537
BRasmussen@joneswaldo.com

Michael L. McGlamry (*pro hac vice* pending)
POPE McGLAMRY, P.C.
3391 Peachtree Road, NE, Suite 300
Atlanta, GA  30326
Ph: (404) 523-7706
Fx: (404) 524-1648
efile@pmkm.com

*Attorneys for Plaintiff*